IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
COLUMBIA DIVISION

Randall S. Page,                    )
                                    )        C.A. No. 3:06-249-CMC
            Plaintiff,              )
                                    )
        vs.                         )            Opinion and Order
                                    )        Granting, in Part, Motion
Lexington County School District One,    )       for Summary Judgment
                                    )
            Defendant.              )
_____    )

        This matter is before the court on Defendant's motion for summary judgment (Dkt No. 40).

For reasons set forth below, this motion is granted in part and denied in part.

## BACKGROUND

        Through this action, Plaintiff, Randall S. Page ("Page"), seeks access to what he describes

as Defendant's "informational distribution system." *See* Dkt No. 25 (amended complaint); Dkt No.

41 at 1 (Plaintiff's memorandum in opposition to summary judgment).[1]  Page maintains that this

collective "system" constitutes a forum subject to First Amendment protection including, most

critically, protection against viewpoint discrimination.

        Page further asserts that he was denied access to the system because of his viewpoint, which

differs from that of Defendant, Lexington County School District One ("District"), on the "Put

Parents In Charge Act" ("PPIC Act").  More specifically, Page asserts that:

> Upon learning of the District's use of public resources to champion a position
> regarding education-related legislation that is contrary to his own, Plaintiff
> asked the District to present his competing views through the same channels of
> distribution.  The District refused Plaintiff's request based solely on his viewpoint,
> after which Plaintiff filed this lawsuit to enforce his First Amendment rights.

---

[1] Page number citations to filed documents refer to the number on the document itself, rather than to the page number shown on the CM/ECF header.

Dkt No. 41 at 2.

The District, by contrast, argues that it has not created any forum relevant to discussion of the PPIC Act or other legislation. While the District concedes that it has used some of its resources to communicate its opposition to the PPIC Act, it maintains that all such speech was its own "government speech," allowing it to choose its own message. Thus, the District asserts it has not created any forum for discussion of the PPIC Act or other legislation.

Page challenges the District's position, arguing first that the doctrine of government speech is not available where the governmental entity has engaged in campaign activities. He further asserts that the speech at issue does not satisfy the relevant tests for "government speech," primarily because the District has acted as a conduit for favored third parties, allowing them to distribute their messages through the District's various channels of communication, while denying Page the same opportunity.

## PROCEDURAL HISTORY

**Original Complaint.** Page's original complaint focused on the District's decision to deny him access to its various modes of communication but contained few allegations relating to the creation of any "forum" subject to First Amendment protections. *See* Dkt No. 1 (complaint filed January 24, 2006). On the other hand, the complaint contained numerous allegations which tended to support the District's position, as stated in its motion to dismiss, that the speech at issue was "government speech," not subject to the viewpoint neutrality requirements which apply once a forum is established. Dkt No. 6 (motion to dismiss).

**Amended Complaint.** The court denied the District's motion to dismiss, but noted that various allegations of the complaint supported the District's position that the speech at issue may

have been government speech not subject to forum analysis.  Dkt No. 22 at 2 (Order dated May 10, 2006).  As allowed by that order, Page filed an amended complaint on May 30, 2006.  The amended complaint acknowledged that the District did not create a public forum simply by engaging in "political" speech on "an educational issue" of public concern.  Page asserted, nonetheless, that the District allowed its communication channels to be *utilized by others* to convey inconsistent and varying positions or opinions on the PPIC Act and thus converted its modes of communication into public forums.  Dkt No. 25.

The amended complaint  asserted three causes of action: one for damages, one for injunctive and one for declaratory relief.  All three claims are, however, founded on alleged violations of Page's First Amendment rights of access to the District's modes of public communication and are pursued under 42 U.S.C. § 1983.  Thus, Page's claims rest solely on alleged First Amendment violations.

**Discovery.**  In its order denying the District's motion to dismiss, the court allowed limited discovery to address the threshold issue of whether a forum was created.  *See* Dkt No. 22 at 2.  Specifically, the court allowed Page to depose the District's Director of School/Community Relations, Mary Beth Hill,[2] concerning the District's dissemination of information and materials regarding the "speech at issue."  The order permitted further discovery only if Hill's deposition "suggest[ed] additional persons were involved in the decisions as to what information was disseminated by the school using the alleged 'information distribution system,' or if it suggest[ed] that persons outside the school district were allowed to submit information for distribution through the school district's information distribution channels."  Dkt No. 22 at 2.

_____

[2] Hill serves as the District's Director of School/Community Relations.  Hill June 16, 2006 deposition ("Hill depos. I") at 9.

The court subsequently allowed limited discovery from several entities whose websites or web-based documents were linked in some manner to the District's website. Dkt No. 37. The purpose of this discovery was to allow Page to test the veracity of Hill's testimony that the District did not distribute any documents (except through its flyer program) or provide links on its website *at the request of any third party*.

In his memorandum in opposition to summary judgment, Page implies that further discovery should be allowed. Dkt No. 41 at 5 (memorandum at 2, referring to "minimal discovery" allowed to date). He has not, however, identified any specific further discovery which he believes is necessary to adequately address the issues now before the court. *See generally* Fed. R. Civ. P.56(f).

## STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate

"specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir. 1995).

## FACTS

**Request for Access.** In a letter dated March 1, 2005, Page wrote to Dr. Karen Woodward, Superintendent of the District, stating that he "was most disturbed to see that Lexington School District One maintains on [its] website information critical of Governor Sanford's Put Parents in Charge education reform initiative." Dkt 25, Ex. M. Page also indicated a belief that various schools "have distributed materials to [their] students and sent e-mails to faculty/staff which were critical" of the PPIC Act. After questioning the propriety of this use of the District's resources "to affect legislation," and its presentation "of a one-sided view of the debate," Page stated:

> I am hereby requesting that Lexington School District One permit equal access to present the other side of Put Parents in Charge to the district's parents and faculty/staff by making available the same distribution method[s] and resources. I have materials, ready for distribution, to present the opposing viewpoint. I simply need equal access to the distribution system which has already been provided to those opposing the Governor's initiative.

> If there are other instances where the district has knowingly permitted materials and/or e-mail to be used critically against the Put Parents in Charge legislation, I am asking that all such instances be disclosed and that the same distribution methods and resources be made available to present the opposing viewpoint.

Dkt No. 25, Ex. M.

5

**District's Response.** Dr. Woodward responded by letter dated March 15, 2005. After acknowledging that Page challenged the District's use of its "information distribution system to present a 'one-sided view' of the debate" regarding the PPIC Act, and that he had requested "'equal access' to the distribution system to present" an opposing viewpoint, Dr. Woodward stated:

> It is the official position of this district, . . . to oppose the Put Parents in Charge bill because we believe such legislation is not in the best interest of public education, specifically, or the State in general.

> We have reviewed our situation and have discussed your request with the district's legal counsel. Our activities in opposition to Put Parents in Charge are not improper, nor has our dissemination of information or distribution of materials created a right of "equal access" to our informational distribution system for you to present your views in support of the bill. *The District does not permit the distribution of any type of outside information or materials which do not directly promote educational, recreational or cultural activities that would be of interest to students or their parents.* Therefore, your request for equal access must be denied.

Dkt No. 25, Ex. N (emphasis added).[3]

**Forum Creation.** As noted above, the court allowed limited discovery to explore the threshold question whether the District had created a forum, as to which Page might claim some right of equal access, or whether the speech at issue was merely government speech, giving rise to no right of access. For present purposes, therefore, the court assumes that *if* a forum for discussion of the relevant issues[4] was created, Page was denied access based on his viewpoint. *See, e.g.,* Hill October

---

[3] In an affidavit filed in support of summary judgment, Dr. Woodward explained that her statement in the penultimate sentence, italicized above, relates specifically to the flyer program, through which a limited category of third parties are allowed to distribute activity-related flyers to students.

[4] Page asserts that the "relevant issues" to be considered in determining if a forum was created would include any legislative issues. The undersigned disagrees as opening of forum for debate on one legislative issue does not necessarily open a forum for debate of all legislative issues. In any case, Page sought only access equal to that provided to opponents of the PPIC Act, not access to any forum used to discuss any legislative issue.

6

5, 2006 deposition ("Hill depos. II") at 141 (acknowledging Page's viewpoint was important to decision to deny access). The critical facts, therefore, relate to whether such a forum was created.

**District Message.** Through Hill's deposition, the District explained that it "decide[s] though a very lengthy process what [its] position is on certain issues and . . . stick[s] to those positions and . . . educate[s] people on [the District's] position, what's best for the school district." Hill depos. II at 143. *See also id.* at 144 (explaining that Page was denied access "[b]ecause we have our own message that we want to do and that's the message we're going to do"). Once the District makes the decision as to the message to be conveyed, Hill is responsible for conveying that message to both internal and external audiences. Hill depos. I at 10-11 (summarizing responsibilities as covering "internal, external and training portions of communications"); *id.* at 20-40 (describing duties in more detail). For example, Hill is responsible for postings on the District's website. Hill depos. I at 71. She is also responsible for educating and communicating with specific groups including school principals, her own staff, and the District's Government Relations Committee ("GRC").[5]

In order to be able to educate these groups and as part of her duties of communicating the District's message, Hill must keep abreast of current issues that may impact the District. Hill depos. II at 126. In that process, she receives information from various groups relating to ongoing legislation and similar current issues, including information relating to the PPIC Act. Although she has occasionally used or passed on legislation-related information obtained from third-parties when it supported the District's position, Hill testified that she has *never* done so at the request of a third party. *E.g.,* Hill depos. II. at 127. *See also* Hill depos. I at 62 (explaining in regard to Choose

-------

[5] The GRC is a group made up of one staff member and one "external" representative (parent or area resident) for each school. In addition, other individuals from outside the schools may ask to be members. Hill depos. I at 23-24.

Children First: "They are not allowed to distribute to everybody.  They may send me something that I think [is] valuable.  And if it's an issue that I agree with . . . I may take it and redo it or send it to a select group, usually the Government Relations Committee.  But we don't send any of that home with kids.").  No contrary evidence has been presented.[6]  *See also* Hill depos. II at 143 (stating that she has never even been asked to distribute third-party opinion information by anyone other than Page).

The only information the District distributes at the request of a third-party is though its flyer program which is used to distribute information to students relating to extra-curricular activities. Hill depos. I at 56-57 (explaining that outside groups are not allowed "to communicate directly to our staff or faculty or students," and that the district does not "distribute for those groups" except as allowed under the flyer program).  To the extent Hill has passed on information relating to the PPIC Act which was received from third parties, she did so based on her belief that the information supported the District position, not based on a third-party request.  In addition, information produced by an individual school's parent-teacher organization or association may be approved for distribution by the school's principal.  Hill depos II at 60-61.

**Informational Distribution System.**  Plaintiff alleges that the District's "informational distribution system" consists of some or all of the following components: "the District's email network, webpage, newsletters, facsimile machines, and other modes of communicating with the public."  Dkt No. 41 at 3.  What evidence has been presented as to these components, any collective

_____

[6]  Despite having been allowed discovery on this point, Page does not refer the court to any documents which would suggest that a request was made by a third party, much less that such a request was granted.

8

system,[7] and their use for the relevant purpose (communicating information relating to the PPIC Act) is discussed below.

**Email network.** Hill or others on her staff utilized the District's email system to communicate with the GRC and various District employees (or board members) regarding the PPIC Act.[8] For example, she sent an email on November 17, 2004 which refers to a request for additional information regarding the Act made by one or more GRC members during a recent meeting. Dkt 25, Ex. C. The email includes a short description of the Act, states the District's opposition to its passage, and provides arguments in support of the District's position. The latter include references to other entities which agree with the District (*i.e.*, the South Carolina School Boards Association and the Superintendents' Division of the South Carolina Association of School Administrators). Excerpts from documents produced by others also appear to have been attached or included. *Id.*

Hill and other individuals on her staff sent numerous additional emails to members of the GRC (with copies to various District employees) relating to the PPIC Act. These emails frequently urged the members of the GRC to take action opposing passage of the Act, such as contacting their legislator. *See, e.g.,* Dkt No. 25, Ex. G (March 18, 2005 email from Hill's staff member, Elizabeth Roof, to GRC members encouraging them to oppose the PPIC Act)[9]; Hill depos. II, Ex. 3 (April 11,

_____

[7] Dr. Woodward used the term "informational distribution system" in her March 15, 2005 letter. The wording choice was her own, rather than Page's, as his letter does not include this precise phrase. He did, however, refer to Defendant's "distribution system."

[8] Hill's department handles communications to and for the GRC, largely through the District's email system. Hill is the conduit through which information is passed to the GRC and she decides what will be sent to them through the District's email network. Hill 6/16/06 deposition at 63.

[9] This email lists two opportunities for the recipient "to voice your support for public education" and encourages them to do so. These opportunities include a radio call in show and a planned group visit to the State House to speak to elected officials. It refers to attached handouts which apparently included a three-page set of "Talking Points" in opposition to the PPIC Act.

2005 email from Hill reminding the GRC members that the District "oppose[s] tuition tax credits and voucher's in any way, shape or form" and encouraging them to contact members of "the Ways and Means Committee"); Hill depos. II at 117 & Ex. 5 (Hill April 15, 2005 email to GRC including text of a letter written by Tommy McPherson and suggesting the recipients refer to this letter in composing their own messages). A number of these emails also included information prepared or provided by third parties. Hill depos. II at 117 & Ex. 5 (including language from McPherson letter); Hill depos. II, Ex. 4 (Hill email, advising that debate on the bill had been delayed for a few days, thanking the recipients for their "calls and e-mails," and including excerpts from an email sent to Hill by Betty Gregory)[10]; Hill depos. II, Ex. 6 (Hill April 20, 2005 email to GRC passing on information received from a GRC member); Dkt No. 25, Ex F (Hill November 24, 2005 email addressing new version of the PPIC Act which she describes as "making a bad bill worse," and attaching "a copy of a news release providing the SCSBA's reaction to the changes").[11]

In her deposition, Hill explained that when third-party materials were included in or attached to her emails, it was for the purpose of promoting the District's (or school board's) position. Hill

_____

[10] Hill explained in her deposition that she had copied the information from an email from Betty Gregory. Hill depos. II at 116. Hill denied, however, that Gregory had asked her to distribute the information to anyone. *Id.* at 116-17 (also stating that she did not think there was any "implicit understanding" that she would distribute the information, but that Gregory would have provided the information because she knew Hill was trying to stay informed on the issue).

[11] Other District employees have used the District's email network in a similar manner. For example, On November 18, 2005, Laura McMahon sent an email to "All LMS" urging them to "stay informed about House Bill 3204," also "known as 'Put Parents in Charge' bill." Dkt. 25, Ex. E. She describes the bill in negative terms and states that it is "becoming a battle between the governor and the dept of ed[ucation.]" and advises that additional information on the bill can be found on the district's website under "Issues" and offers to provide "forms if you would like to be on a mailing list to oppose the passage of this legislation." *Id.*

depos. II at 155.  She did not include such materials for the purpose of promoting the speech of others.  *Id.*  Neither did she include any such materials at the request of a third party.  *E.g.,* Hill depos. II at 116.

Specifically in regard to her November 24, 2005 email, which addressed the new version of the PPIC Act, Hill explained that she obtained this information "in a handout or some other kind of information they had, [and] didn't want to rekey it so [she] lifted it" and attributed it to the original source.  Hill depos. II at 124.  She further explained that she follows this course (copying materials into her emails) when she finds something that "[i]s equal to our message.  If it is what we want to say and they've already written it and they have done a better job than I could do."  *Id.*

Further questioning regarding the same subject matter was as follows:

> Q.    So is it your testimony that when you receive information from a group outside the district, that those groups in your experience never asked you to distribute it to anyone?
>
> A.    Right.  They don't ask me to distribute it.  I get an e-mail.  Is it useful to me or not?  If it's not useful, I trash it.  If it's useful, sometimes I save it because I know it's an issue I might want to go back and learn again.  And sometimes I use it right away.
>
> Q.    And when you . . . go through that decision-making process, do you ever consult with anybody to make that decision?
>
> A.    No.
>
> Q.    You make that decision on your own?
>
> A.    Yeah.
>
> Q.    Okay.  So is it fair to say then that when you get information from an outside organization that they send to you, is it fair to say that you in your sole discretion decide whether to send it out beyond –
>
> A.    To my groups?

Q.     Yes, ma'am.

A.     Yes, that's fair.

Hill depos. II at 7-28.

**Website.**  The District maintains a website which, as of March 23, 2005, included a "Current Issues" page. Dkt 25, Ex. A (Amended Complaint Exhibit A).  The listed current issues include: "Voucher Legislation (also known as "Put Parents in Charge Act)."

Printouts of screens submitted by Page suggest that clicking on this topic takes the user to a short summary of the bill.  The same page includes links to a number of static documents relating to the PPIC Act found on other websites including: the "South Carolina PTA and The Alliance for Quality Education's Ten Reasons to Oppose 'Put Parents in Charge'"; a document entitled "Oppose 'Put Parents in Charge'"; a resolution of the District relating to the PPIC Act; and a letter to the Lexington County Delegation accompanying the resolution.  *Id.* [12]

Although Hill initially testified that she believed any links to the "Choose Children First" website were also only to static documents, the District has since conceded that it did or does maintain a link to the organization's web home page. *See* Dkt 40-2 at 6 (explaining that the purpose of this organization "is to oppose school choice initiatives like PPIC").  Page offers no evidence that any other link on the District's website takes the user to the home page of any other organization

---

[12] Although he could certainly have obtained the necessary information based on his own navigation of the web, Page has not provided an affidavit to explain how one navigates from one screen to another.  Neither has he provided an authenticating affidavit for the screens he has submitted. The court will, nonetheless, presume for present purposes that the documents offered are accurate depictions of the various screens as of the dates reflected on the exhibit itself, and that one can reach them from the District's website via some form of a link.  The court cannot, however, make any more specific assumptions regarding how one navigates from one to the other (*i.e.,* whether it is a direct link from the District's website), except as admitted by the District or explained by Hill in her depositions.

12

whose website "contain[s] specific material on PPIC." *Id.*[13]

Hill testified that she makes the decisions as to what will be included on the District's website, as well as when to provide a link. Hill depos. I at 71. Links are generally made to specific documents which help the District explain the issue or its position, not to the home pages of the other organization. Hill depos. I at 71-72.

> Q.    And how does — if an organization has something that it wants to have a link to [on the District's website], like that PDF document, how does it go about —
>
> A.    They can't.
>
> Q.    They can't what?
>
> A.    Nobody can – there's no – we don't put something on our website at all because somebody wants something on there. We don't make decisions based on that.
>
>        We make decisions based on what is best for children, what is best for the staff and students, what are the board's goals for that year, what are their legislative priorities for that year, and then all of that has to be reflected on the website.

Hill depos. I at 73.

Hill denied that she had ever been asked by anyone other than Page to distribute information though the District's website. *Id.* at 77. No evidence to the contrary has been presented. *See generally id.* at 78 (explaining that any link to the Choose Children First website was not at the request of that organization but was based on Hill's decision to link information that she found useful in presenting the District's message); *id.* at 96-97 ("I don't disseminate other people's

---

[13]    The following sites are, according to the screens submitted by Page, linked in some manner to the District's website: (1) the South Carolina School Boards Association; (2) Choose Children First; (3) the South Carolina Department of Education; (4) the South Carolina Education Oversight Committee; and (5) the South Carolina School Improvement Council.

information, but I look at other people's information and their messages and I say is this message consistent with something I'm trying to do or a message I'm trying to get out for the district?" If so, Hill would decide whether to use it based on whether it was better written than she might produce, or was already done and consistent with the District's message.).[14]

Hill acknowledged, nonetheless, that once an individual navigated to the other website via a District-provided link, including a link to a static document on a third-party site, that individual could navigate to the outside organization's home page. She explained that this was the reason the District included a disclaimer relating to the content of linked pages. *Id.* at 79-80. *See also id.* at 81 (acknowledging that District does not control content of websites to which it provides links); *id.* at 83 (acknowledging that linked sites may take different positions on some issues than does the District, specifically noting that the School Boards Association was more neutral on the school start date issue while the District advocated a specific position); *id.* at 88-89 (discussing other issues on which District and organizations with linked documents or sites may have held differing positions–none involving the PPIC Act).

**Newsletters.**

Two schools within the District prepared newsletters which included full or partial reprints of an article written by Dr. Jim Ray (not a District employee) entitled "Who Will Speak Up for

---

[14] Although the District now concedes that it did provide a direct link to the Choose Children First website, Hill explained in her deposition that she does not normally link to the home page of another organization because she is "not interested in promoting any organizations other than ours." Hill depos. I at 79. She, instead, links to specific documents on the linked sites because she is "interested in issues that those organizations may have." *Id. See also id.* at 80 (stating "If I've [linked to another organization's home page], I didn't do it on purpose. I usually link to the specific thing I want them to look at." Also acknowledging that she might have linked to another home page by explaining "In that case, they may have had multiple information that I thought was good and I just linked to where you could go for that information."); & *id.* at 84(stating that the District's website is linked to "specific issues on the School Board Association's site," rather than to the home page of the organization).

14

Public Schools?" Dkt 25, Ex. H (Gilbert Elementary School newsletter); Dkt 25, Ex. H (Lexington Elementary School newsletter). The article is not addressed specifically to the PPIC Act but does refer to "an organized, malevolent effort to dismantle our schools" which is "coming from voucher, tax credit and charter school advocates." The article urges the reader to "shed the apathy about advocacy that has plagued our ranks and put us in the position of losing viable public schools."[15]

The principals of these two schools made the decision to include Dr. Ray's article in their school newsletters. Hill depos. I at 109. Hill was, however, the principals' source for the article. *Id.* at 110 ( stating that she had provided a copy of Dr. Ray's article to "all the principals in the district"). The decision to do so was her own, although she obtained the information from another public information officer who served in Dr. Ray's district. Hill depos. II at 111 (stating that her counterpart had provided her with a copy because "[h]e knew I had an interest in this issue," but that he "did not ask us" to include it in any distribution or newsletter). *See generally* Hill depos. I at 54 (explaining that all newsletters at the school level are reviewed by the principal who "is ultimately responsible" for their content).

A memorandum distributed in one of the District's schools also refers to the PPIC Act. Dkt No. 25, Ex. D (memorandum dated February 11, 2005). This one page document includes a brief statement describing the PPIC Act as "a potentially dangerous piece of legislation," and encourages the reader to visit the website of "Choose Children First" to get more information. *Id.* It appears to be directed only to staff, rather than parents and teachers. No further authenticating information is provided as to this document. There is, in any event, no evidence that the speaker is a third-party, as opposed to the District itself (speaking through one employee to other employees).

___

[15] The court assumes for present purposes that these newsletters were distributed to parents and students, not just to staff.

**WKM-PTSA Form/Newsletter.**

Page also relies on a document headed "WE ARE IN CHARGE OF OUR CHILDREN"S [sic] EDUCATION." *See* Dkt No. 25, Ex. B. This document encourages its reader to write to the Governor as well as their representative and senator to voice opposition to the PPIC Act. A handwritten note on the bottom of the page identifies the document as "PTSA Newsletter – WKMS." Nothing has been offered to authenticate the source of this document, although Plaintiff refers to it as the White Knoll Middle School Newsletter. *See, e.g.,* Dkt No. 41 at 5. Nonetheless, for present purposes, the court assumes that the document was authored by the PTSA and distributed to students and their parents by or with the permission of the White Knoll Middle School principal.[16] *See infra* "PTSA Materials."

**Flyers.**

The District has a written policy limiting the distribution of third-party written materials to students. Hill depos. II, Ex. 10 (bates no. 243). Specifically, the District allows "the distribution of flier type information or brochures from nonprofit organizations (Boy Scouts, the YMCA, Girl Scouts, etc.) ONLY," and then only if the "material meets [the District's] standards, has been pre-approved by School/Community Relations and appears on the 'Approved Flier List.'" *Id.*

Hill is the superintendent's designee with authority to approve distribution of third-party flyers.[17] Hill depos. II at 135-36. Hill described the decision-making process as "pretty clean cut,"

---

[16] It appears from Hill's deposition that Parent Teacher Associations ( PTAs), Parent Teacher Organizations (PTOs), and Parent Teacher Student Associations/Organizations (PTSAs/PTSOs) are allowed to distribute materials through newsletters at the school level if the distribution is approved by the principal of the school. Hill depos. I at 59-61. No evidence specifically relating to the cited document is, however, provided. Neither has the District challenged Page's characterization of it.

[17] The exception is materials related to fundraising activities of the school itself, which are approved by the principal of that school. Hill depos. II at 135-36.

16

and consisting of two primary criteria. *Id.* at 137-38.   First, the entity must be a 501(c)(3), non-profit, organization.  Second, the information must be "something that is a benefit to the students of the district, character building."  *Id.* at 138-39 (including, as examples, athletic activities and scouting).  There is, however, some degree of value judgment involved in the decision process. *See* Hill depos. I at 57 (indicating flyers are approved only if activity being promoted is "non-controversial and beneficial to the students").

The types of materials allowed to be distributed under the flyer program are, nonetheless, limited to "sign-up announcements [or] registration announcements," rather than "message driven" materials. *Id.* at 140.  Hill could not, in fact, recall any request to distribute a message-driven flyer.[18]  *Id.* (also explaining that "viewpoint" was not an issue because there was "usually not a message in the flier").

A separate policy governs student fundraising activities.  Hill depos. II, Ex 10 (bates no. 244). After explaining the limitations on fundraising, this policy concludes with the following statement which, apparently, refers back to the flyer policy: "Organizations or students seeking to distribute materials to students unrelated to the individual school or school district must have the permission of the superintendent."  *Id.*

**PTSA Materials**.

In addition, the District allows members of the South Carolina Education Association and Parent Student Teacher Association ("PTSA") members who are also employees of the school

_____

[18]  Although she conceded that the District denied Page's request to distribute an opposing viewpoint on the proposed PPIC Act, and did so based on his viewpoint, she explained that his request was a generic "request to present an opposing opinion."  He did not seek specifically to distribute preprinted materials though the flyer program.  Hill depos. II at 142.  Dr. Woodward's letter to Page did, however, refer to the flyer program, as explained in her subsequent affidavit.  The court, therefore, assumes for present purposes that Page's request was interpreted by the District as encompassing a request to distribute information through the flyer program.

17

location at issue "to hand out information about their groups to their peers." Hill depos. II, Ex. 10 (flyer policy, bates no. 243).

Individual schools can also authorize distribution of materials provided by their parent-teacher organizations (referred to as PTOs, PTAs, and PTSAs). Hill depos. II at 60. As Hill explained, "[m]any of the elementary school PTAs and PTOs have newsletters. You won't see that as much at the middle and high school level [where they have PTSAs or PTSOs]. But they qualify to send home something about their meetings or their fundraiser . . . – that's part of the internal school stuff." *Id.* Hill further explained that: (1) each of these groups is a 501(c)(3) organization; (2) the organization would pay for its own printing; (3) distribution would be by "student courier," meaning the students would take the document home; and (4) whether to allow distribution would be decided by the individual principal. *Id.* at 61. *See supra* WKM-PTSA Form/Newsletter (a document apparently distributed under this policy).

**GRC Meetings.** Page suggests that the GRC meetings may, themselves, constitute a forum. *See* Dkt No. 41 at 26-27 (memorandum pages 23-24). In support of this argument, he notes that one member brought documents to a meeting and distributed them to other members present at the meeting. Page does not, however, provide any evidence that he was within the class of individuals who might become members of the GRC or that he sought membership in that body. Neither does he suggest that he was denied membership in the GRC based on his viewpoint or that he attended a GRC meeting and was denied the opportunity to speak or distribute documents based on viewpoint.

**Facsimile Machines and Other Means of Communication.** Although listed as part of the alleged information distribution system, Page has proffered no evidence that the District used its facsimile machines in a manner which could have created a forum for public expression as to any

18

subject matter, much less as to the PPIC Act.  *See also* Hill depos. I at 33 (indicating District's facsimile machine usage is "[n]ot often anymore").  The same is true as to any other form of communication not specifically addressed above.

**Evidence of Inconsistent Positions.**  Page attached several documents to his complaint which support passage of the PPIC Act.  These include an "Executive Summary" of the PPIC Act (Ex. I), a document entitled "The Facts About School Choice and PPIC" (Ex. J), and a list of "Frequently Asked Questions" about "School Choice" authored by Page's organization: "South Carolinians for Responsible Government" (Ex. K).  Dkt No. 25, Ex. I, J & K.  Page has not, however, pointed to any evidence that the District distributed these documents to anyone through any means, other than in response to Page's Freedom of Information Act request.[19]  Thus, there is no evidence to support consideration of these documents in deciding whether the District has created a public forum.

Page has also attached a State Newspaper article entitled "Tuition Credit Bill Faces Uphill Fight" to the amended complaint.  Dkt No. 25, Ex. L.  There is no evidence this document was distributed by the District.

_____

[19]  Hill was asked about Exhibit K in her October 5, 2006 deposition.  Hill depos. II at 131-32 (referring to depos. Ex. 9).  She explained that she received this document from Gilbert High School in response to her request for information to respond to Page's FOIA request.  She does not know how the school obtained the document.  She also denied that it was ever posted on the District's website or otherwise distributed by the District or, to her knowledge, the school.  *Id.* In her subsequent affidavit, Hill provided similar explanations as to Exhibits I and J.

## DISCUSSION

### I.    Government Speech Doctrine.

#### A.    Significance.

As Judge Michael recognized in *Planned Parenthood of S.C., Inc., v. Rose,* 361 F.3d 786 (4th Cir. 2004), the "usual first step" in a case of this nature "is to classify the relevant message as either government speech or private speech."[20]

> This threshold inquiry is generally dispositive in viewpoint discrimination cases because of three common assumptions: first, that all speech is either government speech or private speech; second, that when the government speaks for itself and is not regulating the speech of others, it may discriminate based on viewpoint; and third, that the government may not discriminate based on viewpoint when it regulates private speech.  As the Supreme Court explained in *Rosenberger v. Rector and Visitors of University of Virginia,* 515 U.S. 819, 833 (1995), when the government speaks for itself, it "may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted."  In contrast, "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another." *Id* at 828.

As in *Rose,* the threshold  question in the present case is whether the District has merely engaged in government speech or has, alternatively, created one or more forums for private expression.  If the evidence compels a finding that the speech at issue is government speech, the District is entitled to summary judgment.  On the other hand, if there is any disputed issue of material fact as to whether a forum was created, further proceedings are necessary.

#### B.    Applicable Tests.

The government-speech doctrine is relatively new. *See Rust v. Sullivan*, 500 U.S. 173 (1991) (noting government's authority to select and fund speech in a non-neutral way in order to send its

---

[20]  In his opinion in *Rose,* Judge Michael stated that the specialty license plates at issue constituted a mixture of government and private speech and were, therefore, subject to First Amendment protections against viewpoint discrimination.  While the two remaining judges wrote separate opinions, they did not dispute the basic premises addressed in the text.

own message).  As a result, its limits remain imprecisely defined and subject to some debate  *See Johanns v. Live Stock Marketing Ass'n*, 554 U.S. 550, 574 (2005) (Souter, J., dissenting).[21]

Debate as to the proper application of the doctrine arises, most frequently, where third-party speech is involved as it was in *Johanns* (discussed *infra* at 22).  For instance, the Fourth and Sixth Circuits have reached differing results when the doctrine is applied to messages allowed on specialty license plates.  *Compare American Civil Liberties Union of Tennessee v. Bredesen*, 441 F.3d 370 (6th Cir. 2006) (post-*Johanns* decision finding "Choose Life" message on license plates to be a government message spread by "volunteers")[22]; *with Rose*, 361 F.3d 786 (4th Cir. 2004) (pre-*Johanns* decision finding "Choose Life" message available on license plates to be a hybrid government-private speech where opposing message was not also available); *and Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 617 (4th Cir.), *reh'g en banc denied*, 305 F.3d 241 (4th Cir. 2002) (hereinafter "*SCV*" – finding messages and logos allowed on license plates at the request of private groups were not government speech).

Although the Fourth Circuit found that the plates at issue in *SCV* did not constitute government speech, it acknowledged that:

---

[21]  Justice Souter's dissent focused on the fact that the speech at issue was not in any way identified as the government's speech (including as third-party speech adopted by the government). Such concerns are not present in this case.

[22]  The Sixth Circuit rejected plaintiff's argument that "volunteer dissemination of a government-crafted message creates a 'forum,'" noting that if this argument was  accepted, "the government [would be forced to] produce messages that fight against its policies, or render unconstitutional a large swath of government actions that nearly everyone would consider desirable and legitimate."  As examples, the court noted that the "government can distribute pins that say 'Register and Vote,' issue postage stamps during World War II that say 'Win the War,' and sell license plates that say 'Spay or Neuter your Pets,'" even though some citizens may disagree with these messages.  441 F.3d at 378-79 (footnotes omitted).

> It is well established that "the government can speak for itself." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000). Pursuant to its many and varied functions, "[t]he government is entitled 'to promote particular messages' . . . and to take legitimate and appropriate steps to ensure that its messages are neither garbled nor distorted"– that is, the government may limit the scope of the message it sends. *Griffin v. Dep't of Veterans Affairs*, 274 F.3d 818, 822 (4th Cir.2001) (internal citations omitted). The government may promote its policies and positions either through its own officials or through its agents. This authority to "speak" necessarily carries with it the authority to select from among various viewpoints those that the government will express as its own.

*SCV*, 288 F.3d at 616-17. *See also id.* at 618 (stating "even ordinarily impermissible viewpoint-based distinctions drawn by the government may be sustained where the government itself speaks or where it uses private speakers to transmit its message").

In *SCV,* the Fourth Circuit provided a non-exhaustive list of factors to be considered in determining when government speech is at issue. These included:

> (1) the central "purpose" of the program in which the speech in question occurs; (2) the degree of "editorial control" exercised by the government or private entities over the content of the speech; (3) the identity of the "literal speaker"; and (4) whether the government or the private entity bears the "ultimate responsibility" for the content of the speech, in analyzing circumstances where both government and a private entity are claimed to be speaking.

*SCV*, 288 F.3d at 618 (noting also that "no clear standard has yet been enunciated in our circuit or by the Supreme Court for determining when the government is 'speaking' and thus able to draw viewpoint-based distinctions, and when it is regulating private speech and thus unable to do so").

Since *SCV,* the United States Supreme Court has found speech drafted by a third-party to be government speech when: (1) the government determines an overarching message; and (2) approves every word disseminated at its behest. *Johanns v. Livestock Mktg. Ass'n,* 544 U.S. 550, 561 (2005). In *Johanns*, the Court applied this test to find that the message retained the characteristics and protections of government speech, even though the government was not explicitly credited as the

22

speaker.  *Id.*[23]

Because there may be some doubt as to which test to apply, the court will apply both.  Before doing so, however, the court must address two questions: first, whether the protections afforded government speech were lost because the speech involved "campaign activities"; and second, whether the tests should be applied on a collective ("information distribution system") or an individual component basis.

### C.    Page's proposed limitations.

Page argues that the District's communications are not protected by the government speech doctrine because the speech was used to "engage in campaign activities."   He also argues that the doctrine should not be applied because the remedy of resort to the ballot box would not be effective.  Dkt No. 41 at 5-13.

### 1.    Campaign activity.

In support of the first premise, Page relies on a variety of cases which, with one exception, were decided by state courts.[24]  The sole exception is a nearly thirty-year-old district court decision which does not mention the government speech doctrine.  *See Mountain States Legal Foundation v. Denver School District No. 1,* 459 F.  Supp. 357 (D. Colo. 1978).   Moreover, most of the cases cited rely solely on state law for their decisions.

---

[23]    Some argument can be made that the two factors listed above are not absolute requirements, but merely facts existing in *Johanns* which the Court found to be adequate to support a finding of government speech.  For present purposes, however, this court presumes that *Johanns* expresses a two-factor test.

[24] Page also cites additional authority in the relevant sections of his memorandum, including some federal cases, but not for the critical propositions addressed here.  *See* Dkt No. 41 at 6-13.

Only four cases cited by Page in support of a campaign-activity limitation refer to a possible First Amendment or other federal constitutional violation, and then only where state funds are used to promote a partisan position in an issue pending *before the voters* (*e.g.,* a bond issue or constitutional referendum). For example, in *Mountain States Legal Foundation*, the court stated that interpretation of the state's "Campaign Reform Act [to authorize] partisan use of public funds *in an election of this type* would violate the First Amendment to the United States Constitution." 459 F. Supp. at 360-61 (emphasis added). The "type" election at issue was a ballot measure for adoption of a constitutional amendment. *Id.* (expressing concern that the "use of the power of publicly owned resources to propagandize against a proposal made and supported by a significant number of those who were taxed to pay for such resources is an abridgment of th[e] fundamental freedoms" guaranteed by the First Amendment including "the right of the people to petition the government for a redress of grievances"). Based, in part, on the above conclusion, the court granted a preliminary injunction barring the defendant school district from implementing a resolution authorizing the use of district "equipment, materials, supplies, facilities, funds and employees" to actively oppose the ballot measure. *Id.* at 358 & 361. *See also Carter v. City of Las Cruces,* 915 F.2d 336 (N.M. App. 1996) (denying motion to dismiss claims for wrongful use of public funds "to promote a favorable vote in [an] election" and noting one claim was pursued under 42 U.S.C. § 1983)*; Palm Beach County v. Hudspeth*, 540 So. 2d 147, 154 (Fla. App. 1989) (addressing post-election challenge to a county's expenditure of funds to promote voter approval of a special tax district and referring only to state constitutional provisions, but including language which might suggest federal constitutional concerns) ; *Stern v. Kramasrsky*, 375 N.Y.S.2d 235 (N.Y. Sup. Ct. 1975) (suggesting federal and state constitutional issues were raised by challenge to use of public funds by state agency to

24

campaign for "constitutional amendments to be voted on by the public" but referring expressly only to a state constitutional provision and state statute).

By contrast, two of the cases cited by Plaintiff acknowledge that similar restrictions would not apply when funds are used merely to educate the public in a neutral manner or, more critically for present purposes, by one agency of government to lobby for action by another agency of government. *See Coffman v. Colorado Common Cause*, 102 P.3d 999 (Colo. 2004) (noting that "cases have distinguished between information and electioneering activities; and between lobbying another governmental body at a different level of government and lobbying one's own voters"); *Stanson v. Mott,* 551 P.2d 1, 9 (Cal. 1976) (noting "every court which has addressed the issue to date has found the use of public funds for partisan campaign purposes improper, either on the ground that such use was not explicitly authorized, . . . or on the broader ground that such expenditures are never appropriate." – citations omitted).

Only one of the cases on which Page relies in support of his proposed campaign-activity limitation expressly refers to the government speech doctrine and that case is over twenty years old (pre *Rust*). *See Burt v. Blumenauer*, 699 F.2d 168 (Ore. 1985) (referring to the "developing and as yet undefined constitutional boundaries within which laws concerning government publicity must operate"). The case was, however, ultimately resolved on state statutory grounds. Moreover, the case recognized that the limitations imposed on "government advocacy" in earlier cases applied only to issues pending "before the voters." *Burt*, 699 P.2d at 175.

In short, the cases on which Page relies for a campaign-activity limitation are of limited if any persuasive force given their age, sources, and failure (with one exception) to address the recently developed government speech doctrine. Very few even refer to the First Amendment as a possible

25

basis for disallowing the challenged speech.  The few that do are, ultimately, resolved on other (state law) grounds or, as in *Mountain States Legal Foundation* and *Carter,* make only a preliminary determination in the process of granting a preliminary injunction or denying a motion to dismiss. Finally, to the extent these cases support any limitation, that limitation applies only in the context of an *issue pending before the voters*, which is not the context in which the present claims arise.[25]

### 2.    Ineffectiveness of Ballot Box remedy.

Page also suggests that the government speech doctrine does not apply because the remedy suggested in various cases, resort to the ballot box, would be ineffective.  The cases cited for this proposition overlap with the campaign-activity cases discussed above and are of limited persuasive authority for the same reasons.  Indeed, the one federal case cited by Page in support of limiting the government speech doctrine where resort to the ballot box would be no cure, in fact, supports the alternative premise.  *See* Dkt No. 41 at 12 *(*citing dissent from *Kidwell v. City of Union*, 462 F.3d 620 (6th Cir. 2006)).[26]

---

[25]  In a subsequent section, Page cites one case which suggests a limit on attempts to influence voters to aid a government agency's own lobbying efforts.  *See Miller v. Miller,* 151 Cal. Rptr. 197 (Cal. Ct. App. 1978) (focusing on *audience* rather than objective in stating: "It is one thing for a public agency to present its point of view to the Legislature.  It is quite another for it to use the public treasury to finance an appeal to the voters to lobby their Legislature in support of the agency's point of view.").  The limits discussed in *Miller* were, however, resolved as a matter of state law based on a rationale which would have upheld the expenditure had there been "clear and explicit legislative authorization." *Id.*, 151 Cal. Rptr. at 201.  Such a rationale suggests, by negative inference, that there is no First Amendment limitation.

[26]  The majority in *Kidwell* held that the city did not violate the First Amendment by advocating against a citizen-sponsored ballot measure.  The advocacy at issue was presented through the town newsletter and through advertisements placed in the local newspaper.

In any case, the school's board members are elected. They may be removed, at the next election, if the voters disagree with the manner in which they have exercised their discretion.[27] No more immediate "ballot box" remedy is suggested by the case law.

       **3.**      **State statutory limitations.** Page also cites a provision of state law which he suggests may be violated by the District's use of its resources to oppose the PPIC Act. *See* Dkt 41 at 6 (citing S.C.. Code Ann. § 8-13-1346 (2006) (prohibiting use of public resources to influence the outcome of an election or ballot measure)). Violation of a state law provision would not, however, present a controversy over which this court might exercise jurisdiction. Neither is any state law claim presented in or suggested by the complaint. The court, therefore, expresses no opinion on this or any other state law issue.

       **D.**      **Manner of Application.**

       Page urges the court to consider the District's various available means of communication as a unitary "informational distribution system." Dkt 41 at 1. In support of this position, he relies on Superintendent Woodward's use of this term in her March 15, 2005 letter declining Page's request for "equal access" to whatever means had been used to present the District's views on the PPIC Act to students, faculty and staff.

       There are several difficulties with Page's position. The first is that Page did not request access to all means of communication available to the District. Instead, he requested "equal" access to whatever means of communication had been used to disseminate the District's anti-PPIC Act message. The only evidence of the District's dissemination of an anti-PPIC Act message was

---

      [27] Of course, if the board's actions run afoul of any state law, regulation, or other controlling policy or provision, its actions might be challenged at an earlier time in a state forum. *See infra* § I.C.3. ("State Statutory Limitations").

through:

1)      the District's email system to GRC members and District employees;

2)      two school newsletters (presumably to parents) which attached Dr. Ray's article opposing measures such as the PPIC Act;

3)      links on the District's website (available to the general public) to static documents located on other websites and directly to the Choose Children First website; and

4)      the WKMS-PTSA newsletter (presumably distributed to students and parents though a newsletter distributed at one school).

In addition, as noted above, Page suggests that member-to-member communications in the GRC meetings may have created a forum.

Although there is evidence that the District also maintained a take-home flyer program through which third-parties could distribute information to students and their parents, there is no evidence that this program was ever used to disseminate information about the PPIC Act or any other legislation.

Second, the evidence demonstrates that the District applies different controls to its different methods of communication and uses those methods (or components of the overall "information distribution system") in different ways. For example, the undisputed evidence shows that the take-home flyer program is subject to a written policy which allows its use solely to convey information to students and their parents regarding student activities sponsored by 501(c)(3) organizations. All such requests require District level approval obtained though Hill.

By contrast, the website is used to communicate with a broader audience (to include the general public). While postings are controlled by Hill, subject only to general guidance from her

28

superiors, they are not controlled by any written policy.  There is, moreover, no evidence that anything is posted on the website based on third-party request, whereas the flyer program is designed for the purpose of distributing limited categories of information from a limited category of third-parties.

Newsletters are still subject to "District" control, albeit a much more dispersed control.  That is, school newsletters are produced on a school-by-school basis, subject to approval by each school's principal.  Handouts or newsletters from the various parent-teacher organizations or relating to school fundraisng activities are, likewise, subject to approval by the principals of the individual schools.

The email system is, of necessity, subject to less control in many aspects, as each staff member presumably has an email address with the ability to send and receive information.  The relevant use, however, was the use by Hill and her staff to communicate with the GRC (and faculty/staff groups copied on GRC messages).  As to these communications, Hill testified that she and her staff act as filters and conduit for messages to the GRC through the District's email system.

The diversity of means of communications and corresponding variations in controls and actual use (to distribute information relating to the PPIC Act or not) suggest the need for individual analysis of each component.  Case law, likewise, appears to uniformly approach the question of whether a forum has been created on a component-specific basis.  *See, e.g., Kidwell*, 462 F.3d at 623-24 (addressing access to town newsletter and town treasury (for advertising funds) as distinct "forums" claims).  For these reasons, the court concludes that each component should be analyzed individually.

29

## II.  Standards Applied to Components of Information Distribution System.

### A.    Flyer Program.

It appears that the District created some category of forum through its flyer program.  *See generally Child Evangelism Fellowship of Maryland, Inc. v. Montgomery County Public Schools*, 457 F.3d 376 (4th Cir 2006) (addressing school's take-home flyer program).  At the very least, the District is not entitled to summary judgment that the flyer program is *not* a forum.

This does not, however, end the inquiry.  This is because access to the flyer program was expressly and consistently limited both to a specified category of speaker (charitable organizations holding 501(c)(3) certifications) and a specified purpose (dissemination of information relating to extra-curricular activities for students).  *See id.* at 383 (suggesting school's take-home flyer program was likely a "limited public forum" created by government designation of channel of communication for use by certain speakers or for the discussion of certain topics, but finding it unnecessary to determine the precise category of forum created).

There is no evidence that Page falls within the category of individuals to whom this forum was available.  Neither is there any evidence that Page's intended use of this particular forum falls within its permitted purposes or that the District has allowed others to use this particular forum in the manner Page seeks to use it.  Thus, even if the District maintained an undue degree of discretion to approve or disapprove flyers, Page cannot show injury because he cannot show that he was entitled to access to this forum under its neutral terms.[28]

_____

[28]  The claim that the District retained an undue degree of discretion is based on Hill's testimony that, in addition to determining whether the flyer is offered by a 501(c)(3) organization and relates to a student activity, she also decides whether the activity at issue is a "character building" activity which is "non-controversial" and "beneficial to the students."

Further, as noted above, there is no evidence that the flyer program fell within the scope of Page's request for equal access. This is because there is no evidence the flyer program was used by the District (much less by third parties) to disseminate any anti-PPIC Act messages. There is, in fact, no evidence that the flyer program was ever used to disseminate information relating to any legislation or otherwise except as permitted by the written parameters of the program.

For all of these reasons, the court finds that the District is entitled to summary judgment to the extent Page seeks access to the flyer program. While the flyer program likely constitutes a forum, it is not one to which Page would be entitled to access under its non-discriminatory terms. The court declines to address whether the flyer program otherwise reserves an excessive degree of discretion to the District as the District's exercise of that discretion was not the source of any harm to Page.

### B.    Website, Email Network and Newsletters.

It is beyond doubt that the District's communication of its own position, as stated in its own words, is government speech, regardless of whether that communication was disseminated through its website, email network or newsletters. What requires further analysis is the District's dissemination of communications which originated with a third-party. These communications include language drafted by third parties in emails or newsletters disseminated by the District, and links provided to third-party websites or web-based documents through the District's website.

**Static Documents distributed without third-party request.**[29]  As noted above, the District disseminated various documents to GRC members through its email network, including documents drafted by others. Likewise, Dr. Ray's article was disseminated through two school newsletters and

---

[29] This discussion does not address the White Knoll Middle School-PTSA newsletter, which is addressed separately below.

links were provided through the District's website to certain static documents located on other websites. In each instance, the inclusion of the third-party document was based on the District's decision that the document supported the District's position. There is no evidence that the District ever disseminated such a document based on a third party's request. Moreover, while not necessarily required under *Johanns*, the messages from these third-party documents were presented as being adopted by the District or as support for the District's own position. Under these circumstances, the inclusion, attachment, or linkage to the third-party message is little different from citation to supporting authority. In any event, it clearly satisfies both factors of the *Johanns* test because the District determined the overarching message and approved every word disseminated. *Johanns,* 544 U.S. 561.[30]

Likewise, the four non-exclusive factors set out by the Fourth Circuit in *SCV* support a finding of government speech as to the inclusion of these documents. First, the central "purpose" of the communication was to disseminate the District's message opposing the PPIC Act. Second, because the District decided which documents to disseminate in support of its message, and because these were preexisting documents, it maintained complete "editorial control" of the ultimate message. Further, while the "literal speaker" in the third-party document was not the District, the District was accepting "ultimate responsibility" for the content by offering it as supporting (and in some cases stating) the District's position.

---

[30] Such a test is, necessarily, satisfied when the government itself drafts the message. The more critical question in *Johanns,* and here, is when speech drafted by a third party but disseminated by the government will be treated as the government's speech.

For all of these reasons, the court concludes, as a matter of law, that Defendant did not create a forum subject to First Amendment protections when it used its email network to disseminate messages incorporating or attaching third-party documents. This is, most critically, because there is no evidence that the District made the decision to incorporate or attach any document based on a third-party's request. For the same reason, the court concludes, as a matter of law, that the decisions of two principals to incorporate Dr. Ray's article in their school newsletters and Hill's decision to link third-party documents to the District's website did not create forums. Instead, each of these actions constituted government speech.

**Links to other websites.** Page also argues that the *Johanns* test is not satisfied as to the District's website because the website provides links, directly or indirectly, to the home pages of other websites.[31] Page asserts that such links cause the district to lose control over content and, therefore, to fail the second factor in the *Johanns* test.

In support of this proposition, Page relies on *Putnam Pit, Inc., v. City of Cookeville, Tenn,* 221 F.3d 834 (6th Cir. 2000), a pre-*Johanns* case which applied forum analysis to a city's website which included links to third-party websites. There is, however, a critical distinction between the present case and *Putnum Pit*, because the links in *Putnam Pit* were established at the request of third parties and based on the unfettered discretion of a computer operations manager. *Id.* at 841. There is, moreover, no suggestion that the links in *Putnam Pit* were intended to further support any

---

[31] To the extent the links at issue are to static documents, the court disagrees for the reasons set forth in the preceding section. This section addresses only links to other websites. The proffered evidence supports the conclusion that the District provided a direct link to only one website with content relevant to the PPIC Act. That website is the "Choose Children First" website. The court also disagrees with Page's suggestion that the relevant subject matter is any legislation, such as might require the court to find a forum if any linked website discussed any other legislation (*e.g.,* legislation relating to school starting dates).

message espoused by the city, but were simply allowed as a courtesy to organizations and businesses operating within the city. By contrast, the links on the District website were not based on any third-party request and were intended to further the District's message.

The *Putnam Pit* court had no reason to consider whether or under what circumstances a website owner's *unilateral* decision to link to other documents or websites might create a forum. It did not, therefore, address the government speech doctrine, but proceeded directly to an analysis of the category of forum at issue.[32]

Thus, *Putnam Pit* provides little guidance beyond supporting the proposition that a website link can, depending on the circumstances, create a forum, a proposition with which the undersigned agrees. This court, therefore, returns to the *Johanns* test for guidance as to whether a forum was created by the links at issue in this case.

As to the first *Johanns* factor, the District clearly determined the overarching message it distributed through its website, both as to the PPIC Act and other subjects. In addition, as discussed in the preceding section, the District also approved "every word" of content when it provided a link to a static third-party document because the District, through that linkage, approved and adopted the third-party message as its own.

A closer question is presented to the extent the District provided links directly to home pages of other entities.[33] This is because such a link makes available messages that may not have been in

---

[32] The court applied a two-step analysis to determine "whether the government intended [the] location to be a designated public forum or, instead, a non-public forum." *Id.* at 843-44.

[33] The court rejects the argument that linkage to a static document is the equivalent of linkage to the home page for the website on which that document resides. Movement from one to the other requires affirmative actions by the user which that user would understand not to be the endorsement or action of the District.

existence at the time the linkage was created.  Any such later-posted third-party message would, therefore, not be subject to approval by the District prior to posting.  Consequently, such messages may fail the second part of the *Johanns* test.

In the present case, the only evidence of a relevant linkage (one through which a message relating to the PPIC Act was disseminated) is the District's link to the Choose Children First home page.  That entity's sole purpose is apparently to oppose legislation such as the PPIC Act.  Thus, the District could reasonably predict that the messages on that website would be similar to its own message.  This arguably satisfies the "overarching message" requirement of *Johanns*.

The District would not, however, have maintained "control" over the specific wording (at least absent constant surveillance of the third-party site).  It is also possible (though perhaps not likely), that the third-party could have posted a message with which the District whole-heartedly disagreed.  For these reasons, the second *Johanns* factor would not appear to be satisfied by the linkage to the home page of a third party.[34]  For similar reasons, it is arguable that the District cannot satisfy the second through third factors of the Fourth Circuit test as to the link to the Choose Children First website.  Thus, it is arguable that the linkage directly to the Choose Children First website created a forum for expression of views on the relevant topic.

The court returns, therefore, to whether there can *ever* be a forum where the linkages are made based on the unilateral decision of the owner of the website which provides the linkage.  An argument may be made that no forum is created under these circumstances, as the essence of a forum

_____

[34]  The nature of the entity linked, Choose Children First, would also seem to be similar to the nature of Page's organization.  Thus, unlike the flyer program, the District appears to have allowed a link to one of two similar organizations, based solely on viewpoint.  (Other linked entities appear to have broader education-related purposes).

is the creation of a place where third parties may choose to share their views.   This limit is not, however, clear from the available legal authority.  Moreover, because the court has allowed only limited discovery on this point, it concludes that further development of this issue is appropriate. Therefore, the court denies the motion for summary judgment as to whether the District created a forum by its decision to provide a link to the Choose Children First website.

### C.    White Knoll Middle School – PTSA form/newsletter.

The record is unclear as to the circumstances  surrounding creation and distribution of the document which is found at Exhibit B to the Amended Complaint, which bears a handwritten notation describing it as "PTSA Newsletter-WKMS."  The nature of the document coupled with Hill's general testimony relating to PTSA documents, as well as the District's failure to challenge Page's description of the document as part of a "school" newsletter, however, suggest that it was likely produced by a specific school's PTSA and distributed to students at that school with the approval of the school's  principal.

While the opinion expressed on this document may be consistent with the District's opinion, it is not expressed *as* the opinion of the District.  Instead, the PTSA form/newsletter purports to express the opinion of a third party, the PTSA.   Under these circumstances, and without further explanation, the school's apparent distribution of this form may support a finding that a forum was created for debate of this particular issue which might give rise to a request for equal access.[35] Further development of this point is, therefore, necessary.

---

[35]  Equal access in this regard would likely be limited to the individual school which allowed distribution of this document.  For purposes of this order, the court presumes the distribution by a single school constitutes distribution by the District.

**D.**      **GRC Meetings.**

Assuming without deciding that the GRC meetings constitute a forum, Page has failed to present evidence from which a jury might find a First Amendment violation.  This is because Page has not shown that: (1) he was otherwise eligible for and sought but was denied membership *because of his viewpoint*; (2) that he was otherwise eligible to attend meetings and sought to do so but was denied that opportunity to attend *because of his viewpoint*; or (3) that he attended a meeting and was denied the opportunity to share his views or distribute materials *because of his viewpoint or the viewpoint expressed in the materials*.

In short, even if a forum existed within the GRC meetings, there is no evidence that Page was discriminated against in his ability to attend or participate in those meetings based on his viewpoint. The court, therefore, concludes that any allegations relating to activities which occurred within the meetings do not support a First Amendment claim.

**E.**      **Facsimile and "Other Means" of Communication.**

Page has failed to present any evidence that the District's facsimile machines or any other generically identified means of communication have been used to distribute third-party materials or in any other manner which might create a forum for discussion of the PPIC Act or any other legislation.  Neither has he presented any evidence that such means were used to communicate information specifically relating to the PPIC Act (thus causing it to fall within his request for equal access).  For these reasons, the court concludes that the District is entitled to summary judgment to the extent Page's complaint rests on any claim that a forum was created in the District's facsimile machines or generically identified means of communication.

37

## CONCLUSION

For the reasons set forth above, the court grants the motion for summary judgment except to the extent Page's claims rest on allegations that he was denied equal access equivalent to that provided the PTSA by the White Knoll Middle School or the Choose Children First organization through the link on the District's website.

Further discovery will be allowed as to these topics. Specifically, Page may seek discovery relating to the White Knoll Middle School PTSA form or newsletter, including how and by whom it was prepared, approved and distributed. He may also explore, through written discovery, whether any other school allowed its parent-teacher organizations to distribute documents addressing the PPIC Act. As to the Choose Children First website, the court will allow further discovery relating to how the site came to be linked, including depositions and written discovery requests relating to communications, if any, between Hill (or other District representatives) and members of Choose Children First. The discovery shall be limited to exploration of the decision to link the websites or for the District to otherwise "distribute" materials provided by Choose Children First.

By allowing the matter to proceed, including by allowing further limited discovery, the court does not suggest a predetermination that a forum has been created or that Page has been denied equal access to any forum which may have been created. The court merely determines that such matters should be further developed through discovery and later summary judgment motions or trial.

The parties are directed to confer and submit a proposed amended scheduling order no later than two weeks from entry of this order. The proposed order shall be in the form used in the earlier issued scheduling order. Absent agreement to the contrary, the court will limit the time for additional discovery to 60 days from entry of this order.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
January 17, 2007

C:\temp\notesFFF692\06-249pagevlexcoschoolsjorder.wpd

39