IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
COLUMBIA DIVISION

Randall S. Page,                              )
                                              )        C.A. No. 3:06-249-CMC
                    Plaintiff,                )
                                              )
            vs.                               )        Opinion and Order
                                              )        on Cross Motions
Lexington County School District One,         )        for Summary Judgment
                                              )
                    Defendant.                )
_____)

        Through this action, Plaintiff, Randall S. Page ("Page"), asserts that he was denied access

to what he described as the Defendant's "informational distribution system" in violation of his rights

under the First Amendment of the United States Constitution. *See* Dkt No. 25 (amended complaint);

Dkt No. 41 at 1 (Plaintiff's memorandum in opposition to summary judgment). Page's claims arise

out of his request for access to means used by Defendant, Lexington County School District One

("District"), to oppose legislation referred to as the "Put Parents In Charge Act" ("PPIC Act").


        The District concedes that it denied Page's request to disseminate information, but maintains

that the denial did not constitute viewpoint discrimination because the only PPIC Act-related speech

disseminated by the District was governmental speech. Thus, the District maintains that no forum

was created for discussion of this topic. Page, by contrast, maintains that the District created one

or more fora for discussion of this topic by allowing third parties to disseminate their message using

the District's resources.

        This matter is now before the court on the parties' cross motions for summary judgment (Dkt

Nos. 48 & 49). These motions follow this court's earlier grant of partial summary judgment in favor

of the District. *See* Dkt No. 45 (order granting partial summary judgment).

In its earlier summary judgment order, this court analyzed the various components of the alleged informational distribution system individually. *See* Dkt Nos. 45 at 8-9 (describing asserted "informational distribution system") & 27-29 (explaining reasons for individualized analysis). The court granted the District's motion for summary judgment as to all but two components of the system: (1) links to third-party websites on the District's own website; and (2) newsletters prepared by third parties such as Parent Teacher Associations ("PTAs") which were distributed through the schools. Dkt No. 45 at 31-36. The court allowed further discovery as to these components of the alleged information distribution system. Dkt No. 45 at 38. The present order, therefore, addresses only the website links and PTA/O (or other third-party) newsletters.

For reasons set forth below, the court now finds that the District is entitled to summary judgment as to these two components of the alleged informational distribution system. Defendant's motion for summary judgment is, therefore, granted and Plaintiff's motion is denied.[1]

## STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

---

[1] This order incorporates all factual statements, legal analysis, and conclusions contained in the earlier order granting partial summary judgment to the District (Dkt No. 45) except as specifically modified herein. *See infra* n. 7 (discussing link to South Carolina School Boards Association).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir. 1995).

## FACTS

**Request for Access and Denial.**[2]  This action arises from the District's denial of Page's March 1, 2005 request for "equal access" to means which had been used by the District to communicate with parents, staff and faculty regarding the PPIC Act.  Specifically, Page requested:

> that Lexington School District One permit *equal access to present the other side of Put Parents in Charge to the district's parents and faculty/staff by making available the same distribution method[s] and resources* [as had been used by the District or third-parties through the District's means of communication].  I have materials, ready for distribution, to present the opposing viewpoint.  I simply need *equal access to the distribution system which has already been provided to those opposing the Governor's initiative*.

Dkt No. 25, Ex. M (emphasis added).

––––––––––––––––––––

[2]  The request and response are discussed in more detail in Dkt No. 45 at 5-6.

The District responded by letter dated March 15, 2005, denying Page's request based, essentially, on an argument that the message it was disseminating in regard to the PPIC Act was its own and did not, therefore, create "a right of 'equal access' to our informational distribution system for you to present your views in support of the bill." The District then stated that it did "not permit the distribution of any type of outside information or materials which do[es] not directly promote educational, recreational or cultural activities that would be of interest to students or their parents." Dkt No. 25, Ex. N (emphasis added).[3]

In a subsequent deposition, the primary individual in charge of disseminating the District's message, Mary Beth Hill, conceded that it was "fair" to say that Page's request was "denied . . . based on his viewpoint." Hill October 5, 2006 deposition ("Hill depos. II") at 141. She further explained, however, that Page was denied access "[b]ecause we have our own message that we want to do and that's the message we're going to do." *Id.* at 144. In other testimony Hill stated that, although she has occasionally used or passed on legislation-related information obtained from third-parties when it supported the District's position, she has *never* done so at the request of a third party. *E.g.,* Hill depos. II at 127.

---

[3] In an affidavit filed in support of its first motion for summary judgment, the District explained that the statement relating to distribution of outside materials refers to the District's flyer program, through which a limited category of third parties are allowed to distribute activity-related flyers to students. In Dkt No. 45, this court assumed that the flyer program was a forum but concluded that it was one to which Plaintiff was not entitled to access for reasons unrelated to his viewpoint.

Specifically as to the entity known as Choose Children First ("CCF"),[4] Hill testified: "They are not allowed to distribute to everybody. They may send me something that I think [is] valuable. And if it's an issue that I agree with . . . I may take it and redo it or send it to a select group, usually the Government Relations Committee. But we don't send any of that home with kids." Hill June 16, 2006 deposition ("Hill depos. I") at 62; *see also* Hill depos. II at 143 (stating that she has never even been asked to distribute third-party opinion information by anyone other than Page).[5]

**Website Links.** Hill denied that she had ever been asked by anyone other than Page to distribute information though the District's website. Hill depos. I at 77. No evidence to the contrary has been presented, despite the opportunity for further discovery specific to this issue. *See generally id.* at 78 (explaining that any link to the Choose Children First website was not at the request of that organization but was based on Hill's decision to link information that she found useful in presenting the District's message); Dkt No. 49-5 (letter from counsel for CCF responding to Plaintiff's subpoena).

Page has now presented evidence of two links on the district's website to a third-party home page (as opposed to a static document within a website)[6] where content of the website addresses the PPIC Act. One such link is to the CCF website, which was addressed, in part, in the earlier order. In addition, the District links to the home page of the South Carolina School Boards Association

---

[4] Facts relating to this entity are of particular importance to the present motions because the District included a link on the District's website to the CCF home page. Whether such a linkage creates a forum is one of the two issues addressed by the present motions.

[5] Hill also explained that the only information the District distributes at the request of a third-party is through its flyer program which is used to distribute information to students relating to extra-curricular activities. Hill depos. I at 56-57. This is the flyer program referred to in the District's letter to Page denying his request for access. *See supra* n. 3.

[6] Through its earlier order, this court found that links to static documents constituted government speech, at least when the linkage was not made based on any third party request.

("SCSBA"). That entity also discusses the PPIC Act or other voucher-related legislation on its website.[7]

Discovery completed after this court granted partial summary judgment confirms that the CCF link was created based on the unilateral decision of the District (through Hill), not based on any third-party request to be linked.[8] Further, in the Rule 30(b)(6) deposition of the District, Hill testified that, when she created the link in 2005, CCF "only had . . . that front page. They didn't have pages off of it. They only had a page and it was solely dedicated to vouchers." *Id.*[9] CCF was, moreover, a "single issue" organization at the time the link was created.

There is, likewise, no evidence that the SCSBA website was linked based on any third-party request. This website, which was not specifically discussed in the earlier order, does, however, differ from the CCF website in numerous respects.[10] First, it is a "multipage" website. While the overall focus of the various pages is on matters of general interest to educational entities, the topic of the PPIC Act or other voucher-related legislation is discussed within the website. A user would navigate from the District's website to the voucher-related pages as follows: (1) the District's home page lists various topics including "Board Policies"; (2) clicking on Board Policies takes the user to a page within the District's website which includes a link to the South Carolina School Boards

---

[7] In its earlier order, this court indicated that the District had only one link to the home page of a website which discussed the PPIC Act.

[8] In the Rule 30(b)(6) deposition conducted on April 17, 2007 ("District depos."), Hill confirmed that she was the individual who uploaded the CCF link to the District website. She also confirmed that she did not seek or obtain CCF's permission to create the link. District depos at 20.

[9] The PPIC Act was subsequently abandoned. Other voucher-related legislation was, however, proposed. For purposes of this order, the court assumes that discussion of any voucher-related legislation is within the relevant subject matter covered by Page's request.

[10] The SCBSA website was apparently not addressed in the Rule 30(b)(6) deposition. This is most likely because it was not specifically identified as a concern in this court's earlier order.

Association; (3) that link is to the SCSBA home page which includes a "Legislative Alert" subheading; (4) clicking on any one of a number of the topics listed under this subheading takes the viewer to a discussion of voucher legislation. Dkt No. 48 Ex. B (screen shots) & Ex. H (declaration of M. Todd Carroll laying foundation for screen shots as accessed on May 7, 2007).[11]

Hill testified that, while she did not review all linked documents or websites regularly, she did check links relating to current issues, such as the PPIC Act. She was also occasionally alerted by others to changes in linked websites or documents. Hill depos. I at 81. She was conducting a general review of the District's message, as presented on its webpage, between January and March of 2007 (after the legislature convened and new voucher-related legislation was proposed), when she discovered that CCF had changed its website and was no longer addressing voucher-related legislation. District depos. at 20-21 (explaining that there were then new voucher-related bills replacing the PPIC Act, but that CCF did not address them and, instead, addressed a variety of different subjects such as voter registration). Based on this message change, Hill removed the link to the CCF website during the first quarter of 2007. *Id.* at 28.

**Disclaimer.** The District's website includes a disclaimer which advises the viewer that the District is "not responsible for what may be on other people's [web]pages . . . ." Hill depos. I at 79-80. The specific wording of the relevant portion of the disclaimer is as follows:

> Some Lexington County School District One Web pages have links to other Web sites.
>
> These external Web addresses contain information created, published, maintained or otherwise posted by institutions or organizations independent of Lexington One. Lexington One does not endorse, approve, certify or control these external Web addresses and does not guarantee the accuracy, completeness, efficacy, timeliness,

---

[11] This date is well after Page's request for equal access was made. The District has not, however, offered any evidence that the linkages and content would have been substantially different at any relevant time. For present purposes, therefore, the court assumes that the same or similar linkages existed at all times relevant to this action.

or correct sequencing of information located at such addresses.

Use of any information obtained from such addresses is voluntary, and reliance on it should only be undertaken after an independent review of its accuracy, completeness, efficacy and timeliness. Reference therein to any specific commercial product, process or service by trade name, trademark, service mark, manufacturers or otherwise does not constitute or imply endorsement, recommendation or favoring by Lexington One.

This disclaimer is located within the District website and is accessed by clicking on the "Guidelines" heading located on the District's home page.   It is not specifically referenced in connection with the District's "Board Policies" page, which provides a link to the SCSBA, nor, apparently, was it found on the current issues page which previously linked to the CCF site. *See* Dkt No. 48 Ex. B.   Nonetheless, the court assumes that the disclaimer applies generally to all linked sites and was in effect at all times relevant to this action.

**Third-Party Newsletters Distributed by the Schools.**  Two Parent Teacher Associations ("PTAs") each distributed a single newsletter through school distribution sources which opposed the PPIC Act.  *See* Dkt No. 48-6, Ex. D (attachment to White Knoll Middle School PTA newsletter titled "WE ARE IN CHARGE OF OUR CHILDREN"S [sic] EDUCATION"); Dkt No. 48-8, Ex. F (Gilbert Elementary School PTA newsletter attaching article by Dr. Jim Ray entitled "Who Will Speak Up for Public Schools" which advocates against voucher and other legislation which promotes use of tax dollars to fund private schools).

PTA newsletters are created by officers or members of the PTA and are subject to the editorial control of the principal of the individual school.  *See generally* Hill depos. I at 54 (explaining that all newsletters at the school level are reviewed by the principal who "is ultimately responsible" for their content); Dkt No. 49-7 (Dr. Woodward affidavit explaining school-PTA

relationship).[12]  In some cases, principals will also contribute a column or article to the PTA newsletter as occurred in regard to both of the newsletters at issue.  *See* Dkt No. 48, Ex. D & F (neither principal addresses the PPIC Act in his or her comments).  Nonetheless, the documents themselves purport to be from the third-party PTA, not the school itself.

The PPIC Act/voucher-specific messages in the two PTA newsletters were not, however, identified as being part of a message from the principals of those schools.  Neither is there any evidence that the District or any of its representatives asked that the PPIC Act-specific message be included.

As explained by Hill, individual schools may authorize distribution of materials provided by their PTAs, PTOs, PTSAs, and PTSAs. Hill depos. II at 60 ("Many of the elementary school PTAs and PTOs have newsletters . . . [which] qualify to send home something about their meetings or their fundraiser[s] . . . that's part of the internal school stuff."); *see also* Woodward second affid. ¶ 4.  Hill further explained that: (1) each of these groups is a 501(c)(3) organization; (2) the organization would pay for its own printing; (3) distribution would be by "student courier," meaning the students would take the document home; and (4) whether to allow distribution would be decided by the individual principal.  Hill depos II at 61.

**Non-PTA messages in PTA Newsletters.**  Page has presented evidence that non-PTA

---

[12] Although PTAs and similar organizations are closely affiliated with an individual school, they are independent from the school itself.  *See* Dkt No. 49-7, Woodward second affid. at ¶¶ 2-4 (affidavit of District's superintendent explaining "unique status and relationship" between individual schools and PTA-type organizations).  These and similar support organizations such as booster clubs "are closely affiliated with their respective schools so that they may provide legitimate and systematic participation which fosters selected school activities."  *Id.* at ¶ 2.  For example, they "provide 'manpower' and funding for their schools' educational objectives and activities. Under written Board policy, [they] must establish in writing their purposes, goals and procedures, and must submit those documents to the school principal for joint agreement."  *Id.* at ¶ 3 and Attachment 1. In addition, "[t]heir operations and activities are carried out in conjunction with the school and often only with approval of the school principals."  *Id.* at ¶ 3.

members are occasionally allowed to present an advertising message through a PTA newsletter.

From what is before the court, it appears that a single advertiser "sponsors" a given newsletter

(presumably by providing funding) and, in exchange, is allowed to place an advertisement.  The

newsletters Page has proffered indicate that such privileges have been extended to home builders

and medical providers, who have presented typical commercial advertisements unrelated to any

political message, much less to the PPIC Act.  Neither of the newsletters specifically at issue

included such advertising either in the specific newsletters in which the PPIC Act or voucher-related

message appeared or in any other edition of the newsletters presented to this court.

### DISCUSSION

I.     **Government Speech Doctrine.**

**Generally.**  As explained in the earlier order, the first, and generally dispositive, question

is whether speech disseminated by or through the District's various means of communication is

"government speech or private speech."  *See Planned Parenthood of S.C., Inc., v. Rose,* 361 F.3d

786, 792, *reh'g denied* 373 F.3d 580 (4th Cir. 2004).  This is because "the government . . . may

discriminate based on viewpoint" when it speaks for itself but "may not discriminate based on

viewpoint when it regulates private speech."  *Id.; see also Rosenberger v. Rector and Visitors of

University of Virginia*, 515 U.S. 819, 828 & 833 (1995) (stating that, when the government speaks

for itself, it "may take legitimate and appropriate steps to ensure that its message is neither garbled

nor distorted[,]" but "[i]n the realm of private speech or expression, government regulation may not

favor one speaker over another.").

**Third-Party Speech.**  As discussed in the earlier order, the government-speech doctrine is

relatively new and its limits remain imprecisely defined and subject to some debate.  It is, however,

clear that the government may speak through third parties and that such speech will be deemed

10

government speech even though drafted and presented by a third-party at least when: (1) the government determines an overarching message; and (2) approves every word disseminated at its behest.[13] *Johanns v. Livestock Mktg. Ass'n,* 544 U.S. 550, 561 (2005).

Recent Supreme Court authority has confirmed and clarified that the government retains its "discretion to promote policies and values of its own choosing free from forum analysis or the viewpoint-neutrality requirement . . . even where it chooses to employ private speakers to transmit its message." *Chiras v. Miller,* 432 F.3d 606, 613 (5th Cir. 2005). The underlying justification is that the government has "exercise[d] editorial judgment in choosing among private speakers to facilitate the government's own message." *Id.* (explaining reasoning behind three, relatively recent Supreme Court decisions).

For example, in *Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666 (1998), the Court addressed claims by an independent political candidate who challenged his exclusion from a state-owned public television debate. Finding the decision to exclude the candidate to be governmental speech, the Court explained:

> Much like a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school prescribing its curriculum, a broadcaster by its nature will facilitate the expression of some viewpoints instead of others. Were the judiciary to require, and so to define and approve, pre-established criteria for access, it would risk implicating the courts in judgments that should be left to the exercise of discretion.

*Id.* at 674.

**Hybrid Speech.** In a case decided before *Johanns*, the Fourth Circuit held that when speech

---

[13] The *Johanns* Court did not describe the two factors listed above as absolute requirements. Rather, it discussed these factors as adequate, under the specific facts of that case, to support a finding that the third-party speech was governmental speech despite the absence of any public indication that it was governmental speech.

is a hybrid of government and private speech, it is subject to the same protections as private speech. *Rose*, 361 F.3d 786 (4th Cir. 2004) (pre-*Johanns* decision finding message available on license plates to be hybrid government-private speech where opposing message was not also available). The government is, therefore, prohibited from discriminating based on viewpoint where hybrid speech is involved. *See also Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 617 (4th Cir.), *reh'g en banc denied*, 305 F.3d 241 (4th Cir. 2002) (hereinafter "*SCV*" – finding messages and logos allowed on license plates at the request of private groups were not government speech); *but see American Civil Liberties Union of Tennessee v. Bredesen*, 441 F.3d 370 (6th Cir. 2006) (post-*Johanns* decision finding "Choose Life" message on license plates to be a government message spread by "volunteers").

In *SCV,* the Fourth Circuit provided a non-exhaustive list of factors to be considered in determining when government speech is at issue. These included:

> (1) the central "purpose" of the program in which the speech in question occurs; (2) the degree of "editorial control" exercised by the government or private entities over the content of the speech; (3) the identity of the "literal speaker"; and (4) whether the government or the private entity bears the "ultimate responsibility" for the content of the speech, in analyzing circumstances where both government and a private entity are claimed to be speaking.

*SCV*, 288 F.3d at 618.

In listing these factors, the court acknowledged that "no clear standard has yet been enunciated in our circuit or by the Supreme Court for determining when the government is 'speaking' and thus able to draw viewpoint-based distinctions, and when it is regulating private speech and thus unable to do so." *Id.* The court also indicated that the listed factors were neither "exhaustive [n]or always applicable." *Id.*

## II.     Hill's Concession

In her deposition, Hill answered affirmatively when asked if it was fair to say that the District

had refused to distribute Page's message because of his viewpoint. Taken alone, Hill's response suggests that Page's message would have been distributed, based on his request, had he agreed with the District's position.

Hill's other testimony, however, places her concession in a more limited context. For example, Hill denied *ever* distributing *any* information based on a third-party request, other than through the flyer program. As explained in the first summary judgment order, the flyer program is a forum from which Page and his message would have been excluded in any event for reasons which were viewpoint neutral. *See* Dkt No. 45 at 30-31.

This does not mean that Hill's concession means nothing. Rather, in the context of her full testimony, it supports the conclusion that, had Page's message been consistent with the message of the District, and had Hill felt Page's presentation of his message was useful to the District in advancing its own position, then Hill, acting on behalf of the District, *might* have distributed Page's materials *as further support for the District's own position* (*e.g.,* though a website link such as was provided to CCF or by attachment to or incorporation in other District-distributed documents).

This interpretation of the evidence is consistent with Hill's other testimony and all other evidence. No evidence, other than an out-of-context consideration of Hill's concession, supports any other inference. For these reasons, Hill's concession does not require the court to find a genuine issue of material fact supporting Page's claims.

III.    **Parent Teacher Association Newsletters**

**Scope of Page's Request for Equal Access.**  It is undisputed that PTAs are allowed to distribute newsletters and certain other materials using District resources including student couriers. It is also undisputed that one PTA addressed the PPIC Act directly in a single edition of its newsletter, urging parents to oppose the legislation, while another PTA included a copy of an article by Dr. Ray, which encouraged supporters of public education to take political action to oppose similar measures.[14] Thus, two PTAs either directly or indirectly opposed the PPIC Act through their newsletters, bringing those newsletters within Page's "equal access" request (to the extent the District itself controls that access).[15]

**Governmental Speech.**  PTAs are organizations which are affiliated with but are distinct from the schools which make up the District.  Their  purposes, goals and procedures are subject to approval by the schools' principals.  *Supra* n. 12.  PTA newsletters are also subject to editorial control by a District official (school principal).

These considerations may make the PTAs entities to which a limited forum might be opened without vesting similar rights in the general public, a matter which is discussed below, but do not

---

[14]  It is unclear who made the decision to include these materials in these particular newsletters.  At the least, therefore, there is some evidence that it was not the District itself (or its agents, the school principals) who made the decision.  Thus, the relevant speech is at least mixed government-private speech if not private speech.

[15]  For reasons discussed below, the court concludes that the PTAs and Districts are not one and the same.  This conclusion is a necessary predicate to the conclusion that the PTA newsletters are not governmental speech.  The same conclusion, however, suggests that Page's request to the District for access was not a request to the relevant PTA's to be included in their newsletters.  Thus, to the extent Page's request is that he have access to the PTA newsletters themselves, his claim is barred by: (1) his failure to request inclusion from the relevant entities (the PTAs themselves); and (2) the non-governmental status of the PTA (as only governmental denial of access might support a First Amendment claim).

make a PTA the equivalent of the District itself.  Neither does the evidence compel the conclusion that the District was speaking through the PTA's with regard to the relevant messages in the two PTA newsletters.  Thus, applying the analysis in *Rose*, the court concludes that there is at least a genuine issue of material fact whether the PTA newsletters were private speech or hybrid government-private speech.[16]  In either event, the District could not engage in viewpoint discrimination as to the content of the newsletters.

**Third-Party Speech**.  *Johanns* does not require a different result.  This is because the PTA messages were neither presented as the message of the District, nor do they appear to be the *de facto* messages of the District.  Moreover, the evidence neither supports nor requires the conclusions that the District established the "overarching message" which was presented in the PTA newsletters or even gave general direction to the PTAs as to the subjects to be addressed in their newsletters.  At most, the District (through its school principals) maintained some level of editorial control and failed to delete the subject matter.  Thus, the evidence does not compel the conclusion that the District was speaking through third-parties (the two PTAs) with respect to the PPIC Act or voucher-related messages found in the PTA newsletters.

**Forum Access.**  This does not, however, end the inquiry.  This is because the court must also ask whether the forum at issue was one which was otherwise open to Page.  That is, the court must inquire whether, but for his viewpoint, Page would have been able to present his position through

---

[16]  For present purposes, the court assumes that an article or column written by a school principal and included in a PTA newsletter is, itself, governmental speech.  This would not, however, convert the remainder of the newsletter to governmental speech.  The specific discussion of the PPIC Act and voucher-related legislation did not, in any event, appear in a principal-authored portion of either newsletter.

the PTA newsletters. There is no evidence to support such a conclusion.[17]

To begin with, there is no evidence that Page is a member of any PTA, much less that he is a member of either of the two PTAs at issue. There is, moreover, no evidence that he would be eligible to be a member of either of the PTAs which disseminated the relevant messages or that, even if a member, he would be entitled to submit an article for publication. No other evidence has been submitted to suggest that Page might be within the class of persons (or entities) for whose benefit the PTA newsletter forum was created. *See generally Perry.* 460 U.S. at 50 (finding differential access granted to two unions did not violate First Amendment where one union was the exclusive representative of the teachers in the township and the other was not).

In *Perry*, the Court rejected the lower court's requirement that the school actually endorse the message, noting the basic role of unions in labor-management relationships. *Perry.,* 460 U.S. at n. 10. The Court relied, instead, on the official, representational relationship existing between teachers and the union which had been granted access. *Id.* While a school's PTA may not bear quite the same relationship to parents as an exclusive union does to the represented employees, it does have a unique role in the school-parent relationship which justifies differential access. *See generally,* Woodward second affidavit (discussed *supra* n. 12).

_____

[17] On the other hand, the court finds ample evidence that a forum was opened for discussion of the "subject matter" of the PPIC Act and voucher-related legislation. That forum may be limited to the newsletters of the two PTAs which addressed these issues. The District cannot, however, maintain that the "subject matter" itself was off limits as to the two newsletters which addressed the PPIC Act or voucher-related legislation. *See generally Perry Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 61 (1983) (dissenting opinion noting that "[o]nce the government permits discussion of certain subject matter, it may not impose restrictions that discriminate among viewpoints on those subjects whether a nonpublic forum is involved or not.").

The *Perry* Court also noted that, despite its exclusion from the school's internal mail system, the rival union had "substantial alternative channels . . . for [the desired] communication to take place." *Id.* at 53 (noting that the alternate means ranged from bulletin boards and meeting facilities to the U.S. mail). As did the rival union in *Perry,* Page has substantial alternative means of communicating his message including through his own website (which may be easily located through a simple internet search), various newspapers, and other fora for public debate of the underlying issues.

There is, in any event, no evidence that Page submitted materials to the drafters of either of the subject PTA newsletters asking that those materials be published. *See supra* n. 15. Necessarily, then, there is no evidence that the underlying PTA's accepted anything from Page for publication or that a school official subsequently deleted the article based on Page's viewpoint. Such facts would be a necessary foundation for a First Amendment claim based on viewpoint censorship *by a representative of the District,* (*e.g.,* school principals). Thus, Page's exclusion from the PTA newsletters themselves does not support a First Amendment claim.[18]

Neither is there any evidence that either of the two newsletters at issue carried advertising or any third-party messages not selected or drafted by the PTA's officers and members. The only exceptions relate to the articles contributed by the schools' principals which would, themselves, be governmental speech. Thus, there is no evidence that these particular newsletters were opened to

---

[18] As suggested by the above discussion, a different situation would likely be presented if the District, having allowed discussion of this subject matter in PTA newsletters, then sought to limit the views which could be expressed in those documents by the PTA's officers and members.

other persons for any purpose.[19]

As noted by the Sixth Circuit, a governmental entity may limit access to "non public" or "designated public" fora based on category of speaker or subject matter so long as the limitation is reasonable. *Putnam Pit, Inc. v. City of Cookesville, Tenn.,* 221 F.3d 834, 843 (6th Cir. 2000). Given the undisputed nature of the PTA's and the lack of any evidence to the contrary, the court finds as a matter of law that the District acted reasonably in creating a newsletter forum which was open only to entities such as PTAs and Booster Clubs which were closely associated with the schools themselves. That the District allowed the subject of the PPIC Act and voucher-related legislation to be discussed in some PTA newsletters may preclude the District from limiting what may be said about such legislation in those particular newsletters. It does not cause the newsletters to change their basic nature from non-public or limited-access fora to a forum open to all who desire to speak on the same topic or, alone, create some distinct forum for discussion of the topic.

**Conclusion as to Newsletters.** For the reasons set forth above, the court grants the District's motion for summary judgment to the extent Page relies on the existence of a forum created through any PTA or similar school-affiliated organizations' newsletter. Page's motion for summary judgment is denied to the same extent.

## IV.     Links to Third-Party Home Pages.

Page also asserts that the District created a forum by providing links to the CCF and SCSBA home pages. This argument rests on two related factors which this court considered in denying the

---

[19] What evidence exists of third-party contributions relates to sponsoring advertisers who presented a commercial message in newsletters published by other parent-teacher associations or organizations.

relevant portion of the District's first motion for summary judgment.[20]  First, the links are to the home pages of third-party websites rather than to static documents.  Second, because the links are not to static documents, the District lacks control over changes in content which might be made subsequent to creation of the link.  *See* Dkt No. 45 at 34-36.

Page argues that this absence of control precludes the District from satisfying the second factor in the *Johanns* test or the third and fourth factors discussed in *SCV* as to both links.  As noted above, *Johanns* supports a finding of government speech when the government: (1) determines an overarching message; and (2) approves every word disseminated at its behest.  *SCV*'s third and fourth factors consider the identity of the actual speaker and who bears the ultimate responsibility for the message.

**Website links as fora.**  The basic premise that a link may constitute a forum is supported by *Putnam Pit, Inc., v. City of Cookeville, Tenn,* 221 F.3d 834 (6th Cir. 2000), a pre-*Johanns* case which applied forum analysis to links created on a city's website.  In *Putnam Pitt*, the court applied a two step analysis to determine the nature of a forum created through links to commercial enterprises on the city's website.  The court first considered whether the right to link had been opened to an entire class of speakers or whether access was on an individualized basis.  Despite lax standards for approval, the court concluded that the city "ha[d] not provided open access" as all links were approved "on a one-by-one basis."  *Id.*, 221 F.3d at 844.

_____

[20]  The earlier order presumed that only the link to the CCF website raised these particular concerns.  Subsequent discovery and the District's argument has, therefore, focused on the CCF website.  It now appears, however, that the link to the SCSBA website raises the same concerns as the CCF link because the District's link is to the home page of the SCSBA website and this home page contains further links to pages, within the same website, which discuss voucher-related legislation.  The District has not challenged either premise.  The court, therefore, considers both links in this order.

The court next considered whether the restrictions which had been imposed were "truly part of the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property." *Id.* (internal citations omitted). As to this issue, the court considered both the city's stated purpose and the nature of the forum, concluding that "the city's Web site which established links to other Web sites, is a nonpublic forum . . . ." *Id.* Ultimately, the court concluded that the city could establish a policy to limit who might be linked, so long as the limits were reasonable and did not allow for viewpoint discrimination. The court remanded the action for trial because Plaintiff had raised a genuine issue of material fact regarding whether the refusal to link to its website was based on viewpoint discrimination. *Id.* at 846.

Unlike the present case, the links in *Putnam Pit* were established at the request of third parties and were allowed (or disallowed) based on the unfettered discretion of a computer operations manager. *Id.* at 841. There is no suggestion that the links in *Putnam Pit* were intended to advance any position espoused by the city. Rather, they were provided as a courtesy to organizations and businesses operating within the city. For these reasons, the *Putnam Pit* court had no reason to consider whether or under what circumstances a website owner's *unilateral* decision to link to other websites might create a forum or whether the government speech doctrine might apply.

By contrast, the District's links to the CCF and SCSBA websites: (1) were not created based on any third-party request;[21] (2) were intended to further the District's message (at least to the extent the link to either website was based on the PPIC Act-related message)[22]; (3) were (to the same

---

[21] The earlier denial of summary judgment was intended, in part, to allow discovery on this point. *See* Dkt No. 45 at 35-36.

[22] The CCF link was clearly intended solely for this purpose. The SCSBA link, on the other hand, appears to have been provided more as a matter of general interest or, more particularly, for guidance as to school board policies.

extent) created based on the judgment of a District employee that the link would aid in advancing

the District's message; and (4) were monitored (albeit occasionally) for consistency of message.  As

to the CCF site, the link was ultimately removed when the message no longer furthered the District's

position.

These factors demonstrate significant distinctions between the links at issue in this action and

those at issue in *Putnam Pit*.  *Putnam Pit*, therefore, provides little guidance beyond supporting the

proposition that creation of a website link may, *under some circumstances*, create a forum.[23]

The most critical distinction is that neither of the links at issue in this action was provided

at the request of a third-party.  Thus, it is doubtful whether any "forum" was created.  Instead, in

context, the links appear to be something less[24] than a school district's unsolicited invitation to a

speaker to address a specific topic.  In such circumstances, the District may know the speaker's

general views on the relevant topic but cannot predict the precise message that will be given.  For

the reasons addressed in *Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 674  (1998)

(quoted *supra* at 11), it is doubtful that such an invitation would create a forum at all.  Similarly

here, the provision of an unsolicited link to an organization's home page may not create a forum for

provision of similar links to the home pages of other organizations which desire to speak on one or

more of the topics covered by the initally linked websites.

---

[23]  The court has located no authority, other than *Putnam Pit*, which directly addresses whether and under what circumstances a website link might constitute a forum.

[24]  Here, the speaker has not literally been provided with a platform and a captive audience (as would be the case for a commencement speaker).  Instead, the District has done something akin to publishing a list of sources for further information in support of its position on the legislation (particularly as to the then issue-specific CCF website) or for more general information of frequent interest to website visitors (as to the more general SCSBA website).  The District's website visitor is free to view these websites or not.  The link provided gives only a more convenient means of access than might be obtained through a standard internet search.

**Third-Party Speech.** Before resolving this question or applying the *Johanns* or *SCV* tests, the court must first decide whether the speech at issue is the *content* of the linked site or the *link* itself. Only the latter actually appears on the District's website.

If the link is viewed as a akin to a list of frequently called numbers, recommended reading, or cited sources of more information, and assuming the list represents the District's view alone, it would not seem to constitute third-party speech at all. Rather, the sole speaker is the District which is doing no more than providing a list which constitutes its opinion of what may be of interest to its viewers.

So viewed, there is only governmental speech. Given the common understanding and usage of the internet and *in the absence of any evidence of a third-party request to be linked* (as in *Putnam Pit*), this court believes this is the better analysis.[25] Nonetheless, given the minimal guidance in this area, the court will apply the *Johanns* and *SCV* factors to the combined link and linked content.

**Johanns Factors.** Under *Johanns,* the court looks to whether the government set the overarching message and approved every word of the content.

**CCF.** As to the first *Johanns* factor, the District clearly determined the overarching message it distributed directly through its own website, both as to the PPIC Act and other subjects. At the time the link to CCF was created, the content of the CCF website supported the same position. Further, because CCF's sole purpose at the time was to oppose legislation such as the PPIC Act, the District could reasonably predict that the messages on the CCF website would continue to be similar

---

[25] To hold otherwise would mean that a governmental entity which exercises its discretion to provide an *unsolicited* link to any third-party website (*e.g.,* a district court's link to the local bar association's website) thereby risks creating a forum to which any third-party discussing any topic covered by the linked website might have access.

to its own message.  Thus, the linkage to this single issue organization's home page satisfied the first *Johanns* factor.

The District also approved "every word" of content of the CCF website to the extent the content existed at the time the link was created.[26]  In this regard, it is significant that, at the time the link was created, the CCF website consisted solely of a home page.  Thus, linkage to a single static document was not possible and linkage to the home page was similar to linkage to a single document (albeit not a static document).

The District did not, however, retain control over future content because the link was to a home page rather than a static document.  Neither did the District provide constant monitoring to insure that the home page (and any documents which might be added) remained consistent with the District's message.  It is, in fact, apparent that the CCF message did change and that the change was not noticed (and the link not removed) for some period of time after the change was made.  Thus, an argument can be made that the District's link to CCF's website did not satisfy the second *Johanns* factor, at least if the focus is on the content of the CCF site rather than the link itself.  *But see Downs v. Los Angeles Unified School District,* 228 F.3d 1003 (9th Cir. 2000) (holding that principal's somewhat belated removal of an article from a bulletin board showed sufficient control over the

---

[26]  Page relies on the existence of a disclaimer on the District's website as evidence that the District did not adopt the messages on any linked websites as its own.  While absence of a disclaimer might be stronger evidence in the District's favor, the court does not believe the presence of a general disclaimer that the District is not responsible for third-party website content negates the government speech doctrine.  This is, in part, because a single disclaimer applied to all linked websites, whether linked to the home page or a static document.  In most instances relevant to this opinion, the link was directly to a static document.  The user might, however, navigate from the static document to other material on the same website which was not adopted by the District.

messages espoused on the board to satisfy the requirements of governmental speech).[27]

**SCSBA.**  The link to the SCBSA website home page presents a different scenario for a variety of reasons.  First, the link to this site appears to have been due to more general interest matters as the link appears on a page of the District's website addressing board policies.  To the extent the SCSBA (or its website) addressed voucher-related legislation, it could likely be expected to adopt a similar position to that of the District and its position at the time the link was created would have been known.[28]  Nonetheless, there is no evidence that the link was created for this reason or that the SCSBA website was monitored for its voucher-legislation-related content.[29]

Therefore, to the extent the second factor in *Johanns* is an absolute requirement applied to the *content* of the linked websites, that factor would likely not be met at least as to the SCSBA website and possibly as to the CCF website.  On the other hand, if the issue of control relates to the

---

[27]  In *SCV*, the Fourth Circuit suggested that the *Downs* decision might be limited to situations in which the school acted in its role as educator, with attendant control over what was presented to students.  *SCV*, 288 F.3d at n. 7 (noting that "while relevant [to the] question of whether the speech was government speech or private speech," the *Downs* decision may have been "colored by recognition of the special necessities of the educational environment").  The role of the District at issue in this action involves the political process and interactions with the public at large, not its role as educator and interactions with students.

[28]  The SCSBA website consists of multiple pages including but not limited to pages which take positions on voucher-related legislation.  There is no suggestion that the District retained control over any message on the SCSBA site, beyond the option of deleting the link.  An internet user accessing the SCSBA website from the District's website would first go to the SCBSA home page.  By navigating within that site, the user might or might not come to the SCSBA's discussion of voucher-related legislation.  Nothing on the District's website specifically directs the viewer to that discussion.

[29]  The *Perry* decision (discussed *supra* at 16) is also of some import in evaluating the nature of the link to the SCSBA website because of the nature of the organization as an education-related association.  That is, *Perry* supports allowing differential access to different types of groups.  Because the SCSBA is an education-related association (specifically, a school boards-related association), the link to its website may stand on different footing than other links.  The record is not, however, so developed or so clear as to allow summary judgment on this ground.

linkage itself, the District clearly retains complete control. For the reasons set forth above, the court believes the latter is the proper focus. *See supra* at 19-22.

*SCV* **factors.** Similar concerns (and related considerations) apply to the second through third factors of the Fourth Circuit test as expressed in *SCV*. Neither website identified the District as the literal speaker. However, as discussed above, the District is the literal speaker when one focuses on the link itself. Viewed in this context, which the undersigned believes is the likely context understood by a website visitor, the District is the literal speaker.

## CONCLUSION

For the reasons set forth above, the court grants Defendant's motion for summary judgment in full, albeit not based on all grounds asserted. The court denies Plaintiff's motion for summary judgment. Together with the earlier motion for summary judgment, this resolves all claims in the action in Defendant's favor. Judgment shall be entered accordingly.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
July 20, 2007

C:\Documents and Settings\Glp59\Local Settings\Temp\notesE1EF34\~7392878.wpd

25